Joel E. Tasca, Esq.
Nevada Bar No. 14124
Stacy H. Rubin, Esq.
Nevada Bar No. 9298
BALLARD SPAHR LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135
Telephone: (702) 471-7000
Facsimile:  (702) 471-7070
tasca@ballardspahr.com
rubins@ballardspahr.com

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JESSICA DEMESA, as an individual and on behalf of all others similarly situated. <br><br> Plaintiff, <br><br> v. <br><br> TREASURE ISLAND, LLC, <br><br> Defendant. | Case No.: 2:18-cv-02007-JAD-CWH <br><br> **DEFENDANT'S AMENDED MOTION TO DISMISS FIRST AMENDED COMPLAINT, OR IN THE ALTERNATIVE, FOR A STAY** |

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

DMWEST #38059009 v3

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ..................................................................................................1

II.   RELEVANT FACTUAL ALLEGATIONS ......................................................1

III.  ARGUMENT IN SUPPORT OF DISMISSAL ...............................................3

    A.   Plaintiff's Conclusory Allegations Regarding Use Of An ATDS Are Insufficient To State A TCPA Claim ..........................................................4

    B.   Plaintiff's TCPA Claim Fails Because The FAC Alleges Facts Demonstrating That Plaintiff Provided "Prior Express Consent" ...........................6

        1.   The FAC Alleges That Plaintiff Knowingly Provided Her Cellular Phone Number To Treasure Island ..............................................................6

        2.   The Text Message Was Not For "Advertising" Or "Telemarketing," And So Prior Express Written Consent Was Not Required ......................7

            a.   The Text Message Itself Was Not Advertising Or Telemarketing ..............................................................................8

            b.   Nor May Plaintiff Base Her Claim On The Ivy Webpage Linked In The Text Message ........................................................13

IV.   ALTERNATIVE REQUEST FOR STAY .....................................................14

    A.   Factual Background for Stay Request ......................................................14

        1.   The FCC Is Set To Decide A TCPA Issue That Will Be Binding And Potentially Case-Dispositive Here ......................................................14

            a.   The Unsettled State Of The Law Regarding Required Functionality For An ATDS .......................................................14

        2.   Resolution Of The ATDS Issue Is Potentially Case Dispositive Here ........................................................................................................16

    B.   Argument in Support of Stay ...................................................................16

        1.   Fairness and Efficiency Warrant a Landis Stay ....................................16

            a.   Minimal, If Any, Damage Would Result From A Stay ...............17

            b.   Treasure Island Would Suffer Significant Hardship Without A Stay ..................................................................................17

            c.   A Stay Will Simplify Issues, Proof, And Questions Of Law ........18

        2.   A Stay Is Warranted Under The Primary Jurisdiction Doctrine ..............19

            a.   This Case Requires The Court To Decide What Constitutes An ATDS ...........................................................................20

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada  89135-2958
(702) 471-7000

i

b.   The ATDS Issue Falls Squarely Within The FCC's Regulatory Powers ...................................................................... 21

c.   The ATDS Issue Is Part Of A Comprehensive Regulatory Scheme ............................................................................... 21

d.   The TCPA Requires Expertise And Uniformity In Administration ............................................................................... 21

V.   CONCLUSION ........................................................................................ 22

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

# **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*ACA International v. Federal Communications Commission*,
  885 F.3d 687 (D.C. Cir. 2018) .......................................................... 15, 19

*Aderhold v. car2go N.A. LLC*,
  668 Fed. Appx. 795 (9th Cir. 2016) ........................................................ 7

*Aderhold v. Car2go N.A., LLC*,
  No. C13-489RAJ, 2014 U.S. Dist. LEXIS 26320, 2014 WL 794802 (W.D.
  Wash. Feb. 27, 2014) ............................................................................. 9

*An Phan v. Agoda Co. Pte. Ltd.*,
  Case No. 16-cv-07243-BLF, 2018 U.S. Dist. LEXIS 210648 (N.D. Cal. Dec.
  13, 2018) ............................................................................................ 7, 10

*Armstrong v. Investor's Bus. Daily, Inc.*,
  Case No. CV 18-2134-MWF, 2018 U.S. Dist. LEXIS 216246 (C.D. Cal. Dec.
  21, 2018) ................................................................................................ 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................... 3, 4, 5

*Astiana v. Hain Celestial Grp., Inc.*,
  783 F.3d 753 (9th Cir. 2015) ............................................................... 20

*Baird v. Sabre Inc.*,
  995 F. Supp. 2d 1100 (C.D. Cal. 2014) ............................................... 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 4

*Bodie v. Lyft*,
  Case No. 3:16-cv-02558-L-NLS, 2019 U.S. Dist. LEXIS 9800 (S.D. Cal. Jan.
  15, 2019) ................................................................................................ 5

*Booth v. Appstack, Inc.*,
  Case No. C13-1533JLR, 2016 U.S. Dist. LEXIS 83996, 2016 WL 3620798
  (W.D. Wa. Jun. 28, 2016) .................................................................... 19

*Broking v. Green Brook Buick GMG Suzuki*,
  Case No. 15-1847 (BRM), 2017 WL 3610490 (D. N.J. Aug. 22, 2017) .............................. 12

*Brown v. Elec. Arts, Inc.*,
  724 F.3d 1235 (9th Cir. 2013) ............................................................... 4

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

*Charvat v. EchoStar Satellite, LLC*,
    630 F.3d 459 (6th Cir. 2010) ..................................................................... 20, 21

*Chesbro v. Best Buy Stores, L.P.*,
    705 F.3d 913 (9th Cir. 2012) ....................................................................... 7, 13

*Clark v. Time Warner Cable*,
    523 F.3d 1110 (9th Cir. 2008) ................................................................... 20, 21

*Coulter v. Ascent Mortgage Resource Group LLC*,
    No. 2:16-cv-02237-SB, 2017 U.S. Dist. LEXIS 76012, 2017 WL 2219040
    (E.D. Cal. May 18, 2017) ........................................................................... 18, 19

*Daniel v. Five Stars Loyalty, Inc.*,
    Case No. 15-cv-03546, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015) .................. 12

*Davel Communs., Inc. v. Qwest Corp.*,
    460 F.3d 1075 (9th Cir. 2006) ......................................................................... 21

*Doerken v. USAA Savs. Bank*,
    CV 16-08824-RSWL-MRW, 2017 U.S. Dist. LEXIS 63474, 2017 WL
    1534186 (C.D. Cal. Apr. 26, 2017) ....................................................... 17, 18, 19

*Dominguez v. Yahoo, Inc.*,
    894 F.3d 116 (3d Cir. 2018) ............................................................................ 15

*Edelsberg v. Vroom, Inc.*,
    Case No. 16-cv-62734, 2018 WL 1509135 (S.D. Fla. Mar. 27, 2018) ................. 12

*Fober v. Mgmt. & Tech. Consultants, LLC*,
    886 F.3d 789 (9th Cir. 2018) ............................................................................. 6

*Gage v. Cox Commc'ns, Inc.*,
    Case No.: 2:16-cv-02708-KJD-GWF, 2017 U.S. Dist. LEXIS 63816, 2017
    WL 1536220 (D. Nev. Apr. 26, 2017) ..................................................... 18, 19

*Gensel v. Performant Techs., Inc.*,
    No. 13-C-1196, 2015 U.S. Dist. LEXIS 9736, 2015 WL 402840 (E.D. Wis.
    Jan. 28, 2015) ................................................................................................ 20

*Gusman v. Comcast Corp.*,
    Case No. 13-cv-1049-GPC(DHB), 2014 U.S. Dist. LEXIS 69918, 2014 WL
    2115472 (S.D. Cal. May 21, 2014) .................................................................. 21

*Higgenbotham v. Diversified Consultants, Inc.*,
    13-2624-JTM, 2014 U.S. Dist. LEXIS 65915, 2014 WL 1930885 (D. Kan.
    May 14, 2014) ......................................................................................... 20, 22

*Holt v. Redbox Automated Retail, LLC*,
    No. 3:11-cv-3046(DSM)(RBB), 2013 WL 12114789 (S.D. Cal. Jun. 20, 2013) ......... 9, 10, 13

iv

*Hurrle v. Real Time Resolutions, Inc.*,
 C13-5765 BHS, 2014 U.S. Dist. LEXIS 22204, 2014 WL 670639 (W.D.
 Wash. Feb. 20, 2014) ........................................................................................... 20

*Landis v. N. Am. Co.*,
 299 U.S. 248 (1936) ...................................................................................... 16, 17

*Lockyer v. Mirant Corp.*,
 398 F.3d 1098 (9th Cir. 2005)................................................................................ 17

*Mackinnon v. Hof's Hut Restaurants, Inc.*,
 No. 2:17-cv-01456-JAM-DB, 2017 U.S. Dist. LEXIS 195444 (E.D. Cal. Nov.
 28, 2017)..................................................................................................... 10, 11

*Marks v. Crunch San Diego, LLC*,
 904 F.3d 1041 (9th Cir. 2018) ................................................... 15, 16, 18, 19

*Mendoza v. UnitedHealth Group Inc.*,
 13-1553 PJH, 2014 U.S. Dist. LEXIS 1616, 2014 WL 722031 (N.D. Cal. Jan.
 6, 2014)............................................................................................................ 20

*National Cable & Telecomms Ass'n v. Brand X Internet Servs.*,
 545 U.S. 967 (2005) ............................................................................................ 19

*Pacific Bell Telephone Co. v. California Public Utilities Com'n*,
 621 F.3d 836 (9th Cir. 2010) ............................................................................... 18

*Passero v. Diversified Consultants, Inc.*,
 13-CV-338C, 2014 U.S. Dist. LEXIS 72748, 2014 WL 2257185 (W.D.N.Y.
 May 28, 2014) ................................................................................................... 20

*Reynolds v. Geico Corp.*,
 Case No. 2:16-cv-01940-SU, 2017 U.S. Dist. LEXIS 28867, 2017 WL 815238
 (D. Or. Mar. 1, 2017) ................................................................................... 17, 18

*Rotberg v. Jos. A. Bank Clothiers, Inc.*,
 No. 16-CV-2962 (JPO), 2018 WL 5787480 (S.D.N.Y. Nov. 5, 2018).................................. 14

*Washington v. Six Continents Hotels, Inc.*,
 Case No. 2:16-cv-03719-ODW, 2017 U.S. Dist. LEXIS 3670, 2017 WL
 111913 (C.D. Cal. Jan. 9, 2017).......................................................................... 18

*Smith v. Blue Shield of Cal. Life & Health Ins. Co.*,
 228 F. Supp. 3d 1056 (C.D. Cal. 2017)........................................................ 9, 11, 12

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016) ........................................................................................... 9

*Stephens v. Comenity, LLC*,
 287 F. Supp. 3d 1091 (D. Nev. 2017) ................................................................. 17

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

v

*Syntek Semiconductor Co. v. Microchip Tech. Inc.*,
   307 F.3d 775 (9th Cir. 2002)............................................................................ 20

*Tourgeman v. Nelson & Kinnard*,
   Case No. 16-56190, 2018 WL 4009188 (9th Cir. Aug. 20, 2018) ............................. 9

*Van Patten v. Vertical Fitness Group, LLC*,
   847 F.3d 1037 (9th Cir. 2017) ........................................................................... 6

*Williams v. Nat'l Healthcare Review*,
   No. 2:15-CV-0054-RFB-PAL, 2017 WL 4819097 (D. Nev. Oct. 25, 2017).................. 4, 6, 7

**STATUTES**

28 U.S.C. § 2342 ................................................................................................ 18

47 U.S.C. § 227(a)(1) ....................................................................................... 4, 14

47 U.S.C. § 227(b)(1) ........................................................................................... 21

47 U.S.C. § 227(b)(2) ........................................................................................... 14

**OTHER AUTHORITIES**

47 C.F.R. § 64.1200(f)(1) ....................................................................................... 7

47 C.F.R. § 64.1200(f)(1)&(12) .............................................................................. 8

47 C.F.R. § 64.1200(f)(8) ....................................................................................... 7

47 C.F.R. § 64.1200(f)(12) .................................................................................. 7, 12

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 1, 3

*In re Rules and Regulations Implementing the Telephone Consumer Protection
   Act of 1991*,
   7 FCC Rcd. 8752 (1992) ..................................................................................... 6

*In re Rules and Regulations Implementing the Telephone Consumer Protection
   Act of 1991*,
   21 FCC Rcd. 3787 (rel. Apr. 6, 2006)................................................................. 7, 8

*In the Matter of Rules and Regulations Implementing the Tel. Consumer
   Protection Act of 1991*,
   18 FCC Rcd. 14014 (2003) ................................................................................ 14

*In the Matter of Rules and Regulations Implementing the Tel. Consumer
   Protection Act of 1991*,
   23 FCC Rcd. 559 (2008) ................................................................................... 14

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

vi

*In the Matter of Rules and Regulations Implementing the Tel. Consumer Protection Act of 1991*,
30 FCC Rcd. 7961 (2015) ............................................................................. 14, 16

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Pursuant to the Court's Order re: Motion to Dismiss,[1] Defendant Treasure Island, LLC ("Treasure Island"), by its undersigned counsel, hereby files this Amended Motion to Dismiss the First Amended Complaint ("FAC") filed by Jessica DeMesa ("Plaintiff"), for failure to state a claim upon which relief can be granted.  In the alternative, Treasure Island moves to stay this case pending an anticipated ruling by the Federal Communications Commission ("FCC") regarding the Telephone Consumer Protection Act's ("TCPA") definition of "Automatic Telephone Dialing System" ("ATDS") on which Plaintiff's claim turns.

## I.      INTRODUCTION

Plaintiff brings this suit on behalf of a putative nationwide class alleging that Treasure Island violated the TCPA by sending her an introductory text message through a "virtual concierge" system called Ivy while Plaintiff was a guest at Treasure Island.  Plaintiff's TCPA claim fails on its face for the following separate and independent reasons:

- First, the FAC lacks any supporting factual allegations that the text message she received was sent via an ATDS, which is an essential requirement for a TCPA claim.
- Second, the FAC expressly alleges that Plaintiff provided her phone number to Treasure Island, which constitutes "prior express consent" to the text message she received – a complete defense to her TCPA claim.  Plaintiff tries to avoid this result by alleging that Treasure Island sent the text message for the purpose of "advertising" or "telemarketing," which requires a higher level of consent than purely informational messages.  That allegation, however, fails because the text message, as a matter of law, was not advertising or telemarketing.

If the Court decides not to dismiss this case, Treasure Island requests in the alternative that the Court stay the case.  Under the Court's inherent power to control its own docket, a stay is warranted based on the FCC's anticipated resolution of whether the TCPA even covers the type of equipment that Treasure Island allegedly used to place the calls at issue here.  The anticipated FCC ruling further warrants a stay pursuant to the "primary jurisdiction" doctrine.

## II.     RELEVANT FACTUAL ALLEGATIONS[2]

Treasure Island owns and operates the Treasure Island Hotel and Casino in Las Vegas,

---

[1] ECF No. 53.

[2] Because this is a Rule 12(b)(6) motion, Treasure Island will assume the truth of the FAC's factual allegations, but it does so for purposes of this motion only.

1

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Nevada.[3]  In or about 2016, Treasure Island began working with a California-based company called GoMoment to roll out a guest-engagement platform known as the Ivy virtual concierge.[4] Similar to Siri, Alexa or Google Assistant, Ivy is a form of artificial intelligence that is used to power a messaging system designed to interact with hotel guests.[5]

In April 2018, Plaintiff stayed as a hotel guest at Treasure Island.[6]  Prior to check-in, Plaintiff provided her cellular-telephone number during the online reservation process through Treasure Island's website.[7]  Plaintiff alleges that her cellular number was entered into the Ivy platform or into a database that the Ivy platform was capable of accessing.[8]

Approximately one hour after Plaintiff checked in at Treasure Island, she received a text message from the Ivy system.[9]  The entirety of the text message stated as follows:

> Hi!  I'm Ivy, your personal TEXT Help at Treasure Island.  Txt me for things to do or reply BUFFET23 or LUCKY anytime.  On a scale of 1-5 (5=best), how is your check in and room experience?  Terms:[10]

A link to a webpage followed the word "Terms" in the text message.  Plaintiff does not allege that she actually clicked on the link, but the Complaint alleges that doing so opens a webpage that states the following:

**Ivy will help you during your stay!**

**Want to make a request?**  Close this page, go back to the text message you received, and just reply.  You can ask for towels, get the wifi passcode, or even ask for local recommendations.  If Ivy doesn't know the answer, she will connect you with the front desk. Ivy is available anywhere, anytime during your stay!  So please use her!

**Want to Opt-Out?**  If you do not want to text with Ivy, go back to the text message you received and reply STOP.

**How Does Ivy Work?**  Ivy works simply by text message.  To get started, close this page and reply to the text message you received.

**What Can Ivy Help Me With?**  You can ask for towels, get the wifi passcode, or even ask for local recommendations.  If Ivy doesn't

---

[3] FAC (ECF No. 30), at ¶ 9.
[4] *Id.,* ¶ 10.
[5] *Id.*
[6] *Id.*, ¶ 16.
[7] *Id.*
[8] *Id.*, ¶ 23.
[9] *Id.*, ¶ 16.
[10] *Id.*

2

know the answer, she will connect you with hotel staff.  It's simple. Go back to the text message you received and reply now to make your first request.

**Why Ivy?**  Created by busy travelers, Ivy exists to serve your needs while you're on the go.  Hotel staff can't always attend to your every need right away, so Ivy was created to be your virtual assistant during your stay.  We hope you enjoy Ivy and your travels!  Ivy was developed by Go Moment, and is available to hotels worldwide. Sales & media inquiries can be directed to the Contact Us link below.

**Issues or Opting Out:** Reply "STOP" or "UNSUBSCRIBE" at any time to permanently opt out of Ivy service.  Ivy strives to be helpful in all her interactions, and takes abuse seriously.  If Ivy was anything but helpful to you, please let us know using the Contact Us link below.[11]

Plaintiff alleges that the text message she received was "sent for the purpose of both advertising the availability of the Ivy product, on the one hand, and encouraging the patronage of hotel-related products and services, on the other hand."[12]  The only specific aspect of the text message that Plaintiff identifies as having been sent for that purpose is the phrase, "Txt me for things to do or reply 'BUFFET23' or 'LUCKY'" anytime.[13]  Specifically, she alleges: "On information and belief, these terms were chosen because TI has a buffet and casino, and the references promote and bring awareness to those for-profit products and services.  On information and belief, when guests text Ivy for things to do or reply "'BUFFET23'" or "'LUCKY.'"[14]

Based on these allegations, Plaintiff asserts a single cause of action alleging negligent and willful violations of the TCPA.  She purports to bring her claim on behalf of a putative class of "[a]ll persons who, during the four years prior to the filing of the Complaint in this action through the date of class certification, received one or more text messages from the Ivy concierge sent by TI."[15]

### III.    ARGUMENT IN SUPPORT OF DISMISSAL

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

---

[11] *Id.*, ¶ 18.
[12] *Id.*, ¶ 19.
[13] *Id.*, ¶ 17.
[14] *Id.*
[15] *Id.*, ¶ 25.

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

must "contain [ ] enough facts to state a claim to relief that is plausible on its face."[16]   District courts must apply a two-step approach when considering motions to dismiss.[17]   First, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from the complaint in the plaintiff's favor.[18]   Legal conclusions, however, are not entitled to the same assumption of truth even if cast in the form of factual allegations.[19]   Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice.[20]   Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief.[21]   A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[22]   Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged – but it has not shown – that the pleader is entitled to relief."[23]   When the claims have not crossed the line from conceivable to plausible, the complaint must be dismissed.[24]   "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the [district] court to draw on its judicial experience and common sense."[25]

### A.   Plaintiff's Conclusory Allegations Regarding Use Of An ATDS Are Insufficient To State A TCPA Claim

The TCPA claim fails because Plaintiff has not adequately alleged that she was texted using an ATDS.  The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system [*i.e.*, an ATDS]; (3) without the recipient's prior express consent."[26]   The TCPA defines an ATDS as "equipment which has the capacity − (A) to store or produce telephone numbers to be called, using a random or sequential

---

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) (internal quotation marks and citation omitted).
[17] *Id.* at 679.
[18] *Id.*; *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247-48 (9th Cir. 2013).
[19] *Iqbal*, 556 U.S. at 679; *Brown*, 724 F.3d at 1248.
[20] *Iqbal*, 556 U.S. at 678.
[21] *Id.* at 679.
[22] *Id.* at 663.
[23] *Id.* at 679 (internal quotation marks and citation omitted).
[24] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[25] *Iqbal*, 556 U.S. at 679.
[26] *Williams v. Nat'l Healthcare Review*, No. 2:15-CV-0054-RFB-PAL, 2017 WL 4819097, at *4 (D. Nev. Oct. 25, 2017) (citing 47 U.S.C. § 227(b)(1)(A)(iii)).

4

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  "[F]actual allegations beyond mere statutory language are required which may lead to the inference that an ATDS was used."[27]

Here, the entirety of the ATDS allegations in the FAC are that "Plaintiff is informed and believes, and based thereon alleges, that her cellular telephone number . . . was entered into the Ivy platform or into a database that the Ivy platform is capable of accessing to mass-dial and/or automatically dial numbers[.]"[28]

Merely invoking the words "mass-dial" and "automatic[]" – as Plaintiff has here – is inadequate.  These words amount to nothing more than conclusory legal assertions, devoid of the necessary factual allegations that an ATDS was used.  Courts have repeatedly dismissed TCPA claims in cases involving similar conclusory ATDS allegations.[29]  The same result should obtain here.

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

[27] *Bodie v. Lyft*, Case No. 3:16-cv-02558-L-NLS, 2019 U.S. Dist. LEXIS 9800, **4-5 (S.D. Cal. Jan. 15, 2019).

[28] FAC, at ¶ 23.

[29] *Bodie*, 2019 U.S. Dist. LEXIS 9800, at *5 ("The FAC merely parrots statutory definition of an ATDS alleging, 'the SMS text messages were sent using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers.' . . .  The FAC also alleges that, 'the SMS text messages were sent using equipment that can send a text message to cellular telephone numbers stored as a list or database without human intervention. . .[and] has the capacity to automatically send text messages to telephone numbers generated randomly or sequentially.' . . . .  This falls short of what is required for plausibility. *Iqbal*, 556 U.S. at 678.  Despite alleging that the telephone number that sent the challenged SMS messages belonged to Lyft or its agent, the FAC is devoid of any facts that could support a reasonable inference that Lyft used an ATDS to send the subject text messages."). *Armstrong v. Investor's Bus. Daily, Inc.*, Case No. CV 18-2134-MWF (JPRx), 2018 U.S. Dist. LEXIS 216246, *12-13 (C.D. Cal. Dec. 21, 2018) (holding that ATDS allegations were insufficient as mere recitation of statute when they alleged: "'In sending the text messages at issue in this Complaint, Defendants utilized an automatic telephone dialing system ("ATDS").  Specifically, the hardware and software used by Defendants (or their agents) has the capacity to store, produce, and dial random or sequential numbers, and/or receive and store lists of telephone numbers, and to dial such numbers, *en masse*, in an automated fashion without human intervention.  Defendants ATDS includes features substantially similar to a predictive dialer, inasmuch as it is capable of sending numerous text messages simultaneously (all without human intervention). . . .  Defendants sent the autodialed text messages using equipment that had the capacity to store or produce telephone numbers using a random or sequential number generator, to receive and store lists of phone numbers, and to dial such numbers, *en masse*, without human intervention.  The telephone dialing equipment utilized by Defendants, also known as a predictive dialer, dialed numbers from a list, or dialed numbers from a database of telephone numbers, in an automatic and systematic manner.  Defendants' autodialer disseminated information *en masse* to Plaintiff and other consumers.'") (citing plaintiff's complaint).

**B.      Plaintiff's TCPA Claim Fails Because The FAC Alleges Facts Demonstrating That Plaintiff Provided "Prior Express Consent"**

Plaintiff's own allegations demonstrate that she provided Treasure Island "prior express consent," and her TCPA claim therefore fails as a matter of law.

**1.      The FAC Alleges That Plaintiff Knowingly Provided Her Cellular Phone Number To Treasure Island**

The Ninth Circuit has held that, under the TCPA, a consumer provides "prior express consent" to be contacted "for transaction-related communications ***when the consumer provides his or her phone number to the caller*** . . . ."[30]

Here, the FAC expressly alleges that Plaintiff provided her phone number to Treasure Island when she made her reservation:

> On or about April 27, 2018, Plaintiff checked into the Treasure Island Hotel and Casino.  ***Prior to check-in, during the online reservation process through [Treasure Island's] website, Plaintiff was asked for, and provided, her cellular-telephone number*** . . . .[31]

Plaintiff does ***not*** allege that she ever instructed Treasure Island ***not*** to contact her on her cell phone number.

Moreover, there can be no serious question that the text message at issue related to the transaction for which Plaintiff provided her number.  As set forth above, the content of the text message related to the very same hotel stay for which Plaintiff provided her number at the time of reservation.[32]  Because the Complaint alleges that Plaintiff provided prior express consent to

---

[30] *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1046 (9th Cir. 2017) (emphasis added).  *Accord Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 792 (9th Cir. 2018) ("The FCC has long interpreted the TCPA to embody the principle that 'persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.'  *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992).  That is, in the FCC's view, the very act of turning over one's phone number demonstrates a willingness to be called about certain things, barring instructions to the contrary.  *Id.*").

[31] FAC, at ¶ 16 (emphasis added).

[32] *Cf. Van Patten*, 847 F.3d at 1046 (holding that scope of consent provided by consumer at time of application for gym membership agreement included "the text message's invitation to 'come back' and reactivate his gym membership" following consumer's cancelation of membership, reasoning: "The text messages at issue here were part of a campaign to get former and inactive gym members to return, and thus related to the reason Van Patten gave his number in the first place, to apply for a gym membership."); *Williams*, 2017 WL 4819097, at *8 ("It is undisputed that when Plaintiff arrived at the Hospital, she put her personal information into the Hospital kiosk,

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

receive the text at issue, Plaintiff's TCPA claim fails as a matter of law.

> ### 2. The Text Message Was Not For "Advertising" Or "Telemarketing," And So Prior Express *Written* Consent Was Not Required

Plaintiff will argue that a heightened level of consent – "prior express ***written*** consent" – was required here because the text message at issue allegedly was for the purpose of ***telemarketing or advertising***.  Plaintiff is relying on the TCPA's distinction between purely informational calls or texts (which require only "prior express consent"), and telemarketing and advertising calls or text (which require "prior express ***written*** consent").[33]  Plaintiff is wrong.

The applicable TCPA regulations define "advertisement" as "any material advertising ***the commercial availability or quality of any property, goods, or services***."[34]  The regulations define "telemarketing" as "the initiation of a telephone call or message for the purpose of ***encouraging the purchase or rental of, or investment in, property, goods, or services***, which is transmitted to any person."[35]  In *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012), the Ninth Circuit stated that courts should evaluate the content of purported telemarketing "with a measure of common sense."  Although explicit mention of a good, product, or service is not required in the communication, "the implication" of telemarketing must be "clear from the context."  *Id.*  Messages "whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements."[36]

---

including her . . . phone number. . . . [T]he Court finds that Plaintiff consented to calls regarding core treatment issues, as well as to payment for her treatment, and payment for follow-up or future treatment.").

[33] *See Williams*, 2017 WL 4819097, at *4 (citing 47 C.F.R. § 64.1200(a)(2) (emphasis added).  The applicable regulation defines "prior express written consent" as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."  47 C.F.R. § 64.1200(f)(8).  In addition, "[t]he written agreement shall include a clear and conspicuous disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services."  *Id.*

[34] 47 C.F.R. § 64.1200(f)(1) (emphasis added).

[35] 47 C.F.R. § 64.1200(f)(12) (emphasis added).

[36] *Aderhold v. car2go N.A. LLC*, 668 Fed. Appx. 795, 796 (9th Cir. 2016) (quoting *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 3812, ¶ 49 (rel. Apr. 6, 2006)).  *Accord An Phan v. Agoda Co. Pte. Ltd.*, Case No. 16-cv-07243-

7

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Here, Plaintiff fails to allege that the subject text message was for the purpose of advertising or telemarketing.

### a. The Text Message Itself Was Not Advertising Or Telemarketing The Content Of The Message Was Purely Informational, And Not Advertising Or Telemarketing

Once again, the totality of the text message Plaintiff alleges she received was as follows:

> Hi!  I'm Ivy, your personal TEXT Help at Treasure Island.  Txt me for things to do or reply BUFFET23 or LUCKY anytime.  On a scale of 1-5 (5=best), how is your check in and room experience? Terms:[37]

Thus, the text message contains a greeting from Ivy ("Hi!  I'm Ivy, your personal TEXT Help at Treasure Island"), includes a brief description of how Ivy may be used ("Txt me for things to do or reply BUFFET23 or LUCKY anytime"), asks the guest how her experience has been so far ("On a scale of 1-5 (5=best), how is your check in and room experience?"), and contains a reference to terms followed by a link ("Terms:").

These statements are purely informational in nature.  They do not "encourag[e] the purchase or rental of" Treasure Island's products or services.[38]  The only portions of the message that Plaintiff even alleges do so are the words "BUFFET23" and "LUCKY."  Specifically, Plaintiff alleges that the "message expressly identifies and markets one of TI's main food offerings with the 'BUFFET23' reference, and promotes TI's gaming operations with the word 'LUCKY.'"[39] "BUFFET23" and "LUCKY," however, do not refer by name to any particular Treasure Island restaurant or gaming operation – Plaintiff does not allege the existence of any Treasure Island restaurant called "BUFFET23," or any Treasure Island gaming operation called "LUCKY."  These cryptic references could have been *to anything*, or at least to *any* eating establishment or gaming operation in Las Vegas, Treasure Island-owned or not.  Because "BUFFET23" and "LUCKY" *do not even identify* any Treasure Island product or service, *a fortiori* these terms were not *promoting* any such products or services.

---

[37] BLF, 2018 U.S. Dist. LEXIS 210648, at **18, 20 (N.D. Cal. Dec. 13, 2018) (text messages "sent as part of an ongoing business transaction" between plaintiff and defendant are not advertising or telemarketing when message is "directly germane to the transaction").
[37] FAC, at ¶ 16.
[38] 47 C.F.R. § 64.1200(f)(1)&(12).
[39] *Id.*, ¶ 17.

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

8

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Plaintiff, however, alleges that, *if* she had taken the step to reply to the text she received, she would have received a response from Ivy recommending Treasure Island products and/or services.[40]  Even assuming the truth of this allegation, it would fail on its face.  Initially, in the absence of an allegation that Plaintiff *actually replied to the message and received such purported marketing material*, she lacks standing to base a claim on such material.[41]  Without actually receiving the alleged marketing material, such material could not have invaded Plaintiff's privacy, exposed her to unwanted advertising or telemarketing, caused her emotional distress, caused her pecuniary loss, or caused her any other conceivable type of "real" injury fairly traceable to such material.[42]

Consistent with this rule of standing, courts in TCPA cases have held that a text message must be evaluated *on its face*, and it does not morph into an advertising or telemarketing message based on what a plaintiff *would have* seen had she voluntarily taken additional actions in response to the text.[43]  Just as the plaintiff in *Holt* would have needed to click on the link in the text to the

---

[40] *Id.*

[41] Article III standing requires a concrete injury, meaning it "must be '*de facto*;' that is, it must actually exist. . . .  When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term – 'real,' and not 'abstract.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), as revised (May 24, 2016) (citation omitted).  Moreover, the injury-in-fact must be "fairly traceable" to the challenged conduct of the defendant.  *Id.* at 1547.

[42] *Cf. Tourgeman v. Nelson & Kinnard*, Case No. 16-56190, 2018 WL 4009188, at *1 (9th Cir. Aug. 20, 2018) (holding that plaintiff lacked standing to sue for alleged Fair Debt Collection Practices Act violations in letters he never saw, reasoning that unseen letters could not have caused "real" injury for purposes of *Spokeo* standing analysis).

[43] *See, e.g., Holt v. Redbox Automated Retail, LLC*, No. 3:11-cv-3046(DSM)(RBB), 2013 WL 12114789, at *4 (S.D. Cal. Jun. 20, 2013) ("Plaintiffs argue the texts referenced a link to Defendant's website and solicited Plaintiffs to visit the website.  According to Plaintiffs, if the consumer clicks on the link it takes the consumer to Defendant's website where Defendant offers deals, movies and games, among other things. ***The Court, however, declines to adopt this 'look through' approach to liability under the TCPA.  Rather, the Court looks to the texts themselves, and the texts at issue in this case do not contain any marketing or promotional information for products or services.  Plaintiffs' approach goes beyond what is actually stated in Defendant's confirming texts and invites liability based on what a consumer would find if he or she pursued the link.***") (emphasis added); *Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 U.S. Dist. LEXIS 26320, 2014 WL 794802, at *9 (W.D. Wash. Feb. 27, 2014) ("Attempting to connect the car2go text [Plaintiff] received to the sort of telemarketing call that is at the heart of the TCPA, he argues that because the text directed him to place an activation code into an email that ultimately connected to the car2go website which contains promotions for the car2go service, it was a telemarketing text. . . .  It is manifestly insufficient that Mr. Aderhold could, after choices of his own making, divert himself from the registration process to car2go marketing."); *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1067 (C.D. Cal. 2017) ("The mere fact that parts of Blue Shield's website contains the capability of allowing consumers to engage in commerce does not transform any message including its homepage into telemarketing or advertising.")

defendant's website to be exposed to marketing material, here Plaintiff would have needed to reply to the Ivy welcome text before she allegedly would have seen any marketing material. Like the *Holt* court, this Court should reject a "look through" approach to TCPA liability.[44]

**(1)     The Context Of The Message Further Demonstrates It Was Not For Advertisement Or Telemarketing**

The *context* of the message at issue confirms that it may not be construed as an advertisement or telemarketing. As noted above, a text message whose purpose is to facilitate an ongoing transaction previously agreed to by the plaintiff does not constitute advertisement or telemarketing.

Here, the text at issue was not sent out-of-the-blue from an entity that was a stranger to Plaintiff. Instead, Plaintiff and Treasure Island were involved in an ongoing transaction – previously agreed to by Plaintiff – when the message was sent. Specifically, the FAC demonstrates that Plaintiff initiated a transaction with Treasure Island when she made her online reservation. Plaintiff and Treasure Island were thereafter involved in an ongoing transaction for a room and hospitality services until the time Plaintiff completed her stay at the hotel. The welcome text Plaintiff received after she checked in was designed to facilitate the servicing of hospitality-related needs that Plaintiff might have during her stay. Because the text message was directly germane to the ongoing transaction between Plaintiff and Treasure Island, it was not advertising or telemarketing. In analogous circumstances, courts have held that similar text messages were not advertising or telemarketing.[45]

Moreover, the inclusion of "BUFFET23" and "LUCKY" in this transactional message – even accepting Plaintiff's allegation that these words invited a reply for information on Treasure

---

[44] *Holt*, 2013 WL 12114789, at *4.

[45] *An Phan*, 2018 U.S. Dist. LEXIS 210648, at **18-19 (text messages from online travel booking company (Agoda) to customer (Phan) confirming booking and providing link to Agoda app "were sent as part of an ongoing business transaction between Agoda and Phan. Phan used Agoda's services to book a travel itinerary online. Up until the time he finished his travel, he could cancel that booking or otherwise modify it through Agoda."); *Mackinnon v. Hof's Hut Restaurants, Inc.*, No. 2:17-cv-01456-JAM-DB, 2017 U.S. Dist. LEXIS 195444, at *1 (E.D. Cal. Nov. 28, 2017) (text message sent by defendant-restaurant confirming reservation and providing a link to "View specials" was not advertising or telemarketing because it "only served to confirm an expected commercial transaction (eating at Defendant's restaurant) that Plaintiff had initiated.").

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Island products and services – does not change this result.  In *Mackinnon*, for example, the court held that "the phrase 'View specials'" in a text message from a restaurant to a restaurant patron after the patron made a reservation "does not somehow convert the text message into an advertisement.  Plaintiff initiated the dining transaction by making a reservation at Defendant's restaurant. . . .  The link to view specials . . . would have facilitated Plaintiff's dining transaction by allowing him to view specials on his cellphone before sitting down for dinner."[46]  Likewise here, the Ivy text message's alleged invitation for Plaintiff to view information about Treasure Island's dining and gaming options did nothing more than facilitate the types of activities any guest at a Las Vegas Strip resort would expect to be available during his or her stay.

> **(2)      The Allegation That Treasure Island Increases Its Revenue Through Use Of The Ivy System Does Not Transform The Ivy Welcome Text Into Advertising Or Telemarketing**

Plaintiff is left with the amorphous allegation – untethered to any language in the text message – that the Ivy product is designed as a way for hotels like Treasure Island to increase revenue.[47]  Even were it true that increasing revenue was part of Treasure Island's motivation for using Ivy to communicate with guests, that does not transform a purely informational text into one that is for the purpose of advertising or telemarketing.

Case law makes this point clear.  In *Smith v. Blue Shield of California Life and Health Insurance Co.*, 228 F. Supp. 3d 1056 (C.D. Cal. 2017), health insurance provider, Blue Shield, left a prerecorded phone message with its customers prior to the time for renewal of coverage, advising the customer to review his or her current plan options, that Blue Shield had recently mailed information comparing the customer's current plan to "other options from Blue Shield," and referring the customer to the Blue Shield website.[48]  The plaintiff in *Smith* argued that "even if the text is facially informative, Blue Shield's overarching incentive to retain customers and receive premium payments creates a clear implication of encouraging purchase of a good, product, or

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

---

[46] *See, e.g.*, *Mackinnon*, 2017 U.S. Dist. LEXIS 195444, at *1.
[47] FAC, ¶ 13.
[48] *Smith*, 228 F. Supp. 3d 1056, 1058-59 (C.D. Cal. 2017).

service."[49]  The court rejected this argument:

> [T]hat purpose is simply too attenuated to give rise to a *clear*, unequivocal implication of advertising. . . .  Were this Court to hold otherwise, it would transform practically all communication from any entity that is financially motivated and exchanges goods or services for money into telemarketing or advertising, which would contravene the delineated definitions of telemarketing and advertising in 47 C.F.R. § 64.1200(f)(1),(12). . . .

> If the Court accepted Plaintiff's argument, nearly all innocuous, customer-friendly and informative gestures would be needlessly transformed into telemarketing and advertising.

> Evaluating Blue Shield's call with a measure of common sense, the Court must conclude that the call is not telemarketing or advertisement within the meaning of 47 C.F.R. § 64.1200(f)(1),(12).[50]

Other courts have held similarly.[51]  Likewise here, even if Treasure Island's motivation for using Ivy was in whole or in part to eventually steer guests toward Treasure Island products and services, that motivation is irrelevant because the content of the message itself was purely informational, and contained no language that could be construed as advertising or telemarketing such products and services.

---

[49] *Id.* at 1067.

[50] *Id.* at 1067-68 (citation omitted) (footnote omitted).

[51] *See, e.g.*, *Daniel v. Five Stars Loyalty, Inc.*, Case No. 15-cv-03546, 2015 WL 7454260, at *4 (N.D. Cal. Nov. 24, 2015) (holding that text that stated "Welcome to Five Stars, the rewards program of Flame Broiler.  Reply with your email to finish registering and get free pts" was not for advertising or telemarketing purposes, explaining: "To the extent that it could be reasonably inferred based on context or otherwise that the text's purpose was also to 'encourage future purchases at Flame Broiler,' that purpose is simply too attenuated to make the text telemarketing within the meaning of 47 C.F.R. § 64.1200(f)(12).  Certainly, the text was designed to allow Daniel to complete the registration process, which could result in an increase in the chances of Daniel making future purchases at Flame Broiler or other participants in the Five Stars program.  But Daniel cites no authority indicating that this degree of connection between communication and purchase is sufficient to transform a text of the sort he received into a telemarketing message."); *Broking v. Green Brook Buick GMG Suzuki*, Case No. 15-1847 (BRM), 2017 WL 3610490, at *5 (D. N.J. Aug. 22, 2017) (car dealership's pre-recorded message stating that it was "calling regarding your last service visit" was not for advertising or telemarketing, even though dealership testified that purpose of call campaign was "ultimately to sell more cars to former customers," reasoning: "This purpose is too attenuated from the robocall. . . to render the robocall a telemarketing message. . . .  Green Brook may have been motivated by a desire to cultivate goodwill with former customers through the robocall, but such a broad view of a business's aims" would transform practically all communications by business into telemarketing or advertising); *Edelsberg v. Vroom, Inc.*, Case No. 16-cv-62734, 2018 WL 1509135 (S.D. Fla. Mar. 27, 2018) ("communications that merely include collateral opportunities to purchase something from the caller do not constitute" telemarketing or advertising communications "where the opportunity to purchase something from the caller is too attenuated from the purpose of the initial communication").

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

12

**b.** **Nor May Plaintiff Base Her Claim On The Ivy Webpage Linked In The Text Message**

Aside from the text message itself, Plaintiff appears to try to premise her claim on the content of the Ivy webpage accessible via the link in the message following the word "Terms."[52] Yet, Plaintiff does not allege that she ever clicked on the text message's link to view the Ivy webpage. For the same reasons discussed above, Plaintiff may not premise standing on material she does not allege she ever viewed. In addition, Plaintiff's allegation fails because – as explained above – courts should examine only the face of a text message when determining whether it is for advertising or telemarketing purposes; a court should not "click through" to any website link contained in the text message.[53]

Still another defect in these allegations is that the Ivy webpage does not even contain *any* arguable express or implied reference to *Treasure Island's* products or services. Although the FAC alleges that the webpage "advertis[ed] the availability of the Ivy product,"[54] Plaintiff cannot premise her claim on the theory that the website promoted *the Ivy Product*. Preliminarily, there are only two sentences that could even arguably be construed as advertising or telemarketing on what is otherwise a purely informational Ivy webpage.[55] Those sentences state: "Ivy was developed by Go Moment, and is available to hotels worldwide. Sales & media inquiries can be directed to the Contact Us link below."[56] Evaluating these sentences "with a measure of common sense" as the Ninth Circuit requires, they too cannot be construed as advertising or telemarketing giving rise to a suit on behalf of Plaintiff.[57] These sentences are plainly directed at *hotel owners and operators*, and *not hotel guests* like Plaintiff. An individual consumer like Plaintiff obviously has no use for a "virtual concierge" system like Ivy that is used to communicate with hotel guests. Treasure Island is unaware of any case in which a court has held that a message encouraging a purchase *by someone other than the consumer to whom the message was directed,* is advertising

---

[52] FAC, at ¶ 18.

[53] *See Holt v. Redbox Automated Retail, LLC*, No. 3:11-vc-3046(DSM)(RBB), 2013 WL 12114789, at *4 (S.D. Cal. Jun. 20, 2013).

[54] FAC, at ¶ 19.

[55] Treasure Island in no way concedes that these sentences do in fact constitute advertising or telemarketing.

[56] FAC, at ¶ 18.

[57] *Chesbro*, 705 F.3d at 918.

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

1    or telemarketing creating a right on the part of the consumer to sue under the TCPA.[58]

2    **IV.    ALTERNATIVE REQUEST FOR STAY**

3         **A.    Factual Background for Stay Request**

4         If the Court does not dismiss this case outright, the Court should stay the case. As detailed

5    below, the FCC is set to rule on the proper scope of the term ATDS under the TCPA.  The outcome

6    could render Plaintiff's TCPA claims meritless.

7              **1.    The FCC Is Set To Decide A TCPA Issue That Will Be Binding And
                    Potentially Case-Dispositive Here**

8

9         The FCC is currently considering a TCPA issue that is potentially case-dispositive here –

10   specifically, the functionality that equipment must have to fall within the definition of ATDS.

11             **a.    The Unsettled State Of The Law Regarding Required
                    Functionality For An ATDS**

12

13        A brief background on this issue is helpful to understanding Treasure Island's position.

14   The TCPA defines an ATDS as "equipment which has the capacity . . . to store or produce

15   telephone numbers to be called, using a random or sequential number generator . . . [and] to dial

16   such numbers."[59]  Congress specifically instructed the FCC to prescribe rules and regulations to

17   implement certain aspects of the TCPA, including the ATDS definition.[60]  Over the years, the FCC

18   issued a number of rulings that a "predictive dialer" – which is a type of equipment that dials from

19   a pre-existing list of telephone numbers (as opposed to numbers randomly or sequentially

20   generated by the equipment) – constitutes an ATDS.[61]  Earlier this year, the U.S. Court of Appeals

21

22   _____

[58] *Cf. Rotberg v. Jos. A. Bank Clothiers, Inc.*, No. 16-CV-2962 (JPO), 2018 WL 5787480, at *10
23   (S.D.N.Y. Nov. 5, 2018) (text message sent to consumer of retail clothing store that contained link
     leading to sales webpage of mobile marketing company that supported clothing store, was not
24   advertising or telemarketing that could form basis for consumer's TCPA suit, reasoning: "it would
     be odd indeed" for mobile marketing company to employ text message "sent to an individual
     consumer of JAB's retail clothing as an opportunity to advertise its mass marketing services geared
25   toward 'some of the world's largest brands'").

[59] 47 U.S.C. § 227(a)(1).
26   [60] 47 U.S.C. § 227(b)(2).

[61] *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Protection Act of
27   1991*, 18 FCC Rcd. 14014, 14091-93 (2003); *In the Matter of Rules and Regulations Implementing
     the Tel. Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 566 (2008); *In the Matter of Rules
28   and Regulations Implementing the Tel. Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7972
     (2015).

14

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

for the District of Columbia Circuit – in an appeal pursuant to the Hobbs Act, which is the only way an FCC ruling may be challenged – vacated the portion of the 2015 FCC ruling that included predictive dialers within the ATDS definition.[62]  The D.C. Circuit, however, did not specifically rule on whether predictive dialers **could be** included within the ATDS definition, leaving the resolution of this issue to courts or the FCC if it chose to take up the issue again.

Shortly after the *ACA International* decision, the FCC issued a Public Notice on May 14, 2018, seeking comment on interpretation and implementation regarding the definition of an ATDS, including whether ATDS encompasses equipment – like many predictive dialers – that cannot itself generate and dial random or sequential phone numbers.  The deadline to file comments expired on June 28, 2018.[63]

In the meantime, post-*ACA International*, courts are split as to whether the ATDS definition is limited to equipment that has the capacity to randomly or sequentially generate phone numbers.  Some courts have held that it is so limited.[64]  Other courts, including the Ninth Circuit in its September 2018 decision in *Marks v. Crunch San Diego, LLC*, have held that the ATDS definition may also encompass equipment that has the capacity to automatically dial **pre-existing numbers that were inputted into and are stored** on the equipment.[65]

On October 3, 2018, the FCC – in direct response to the *Marks* decision – requested further public comment on what constitutes an ATDS.[66]  Specifically, the FCC sought comment on the following issues:

> 1.   How to interpret and apply the statutory definition of an

---

[62] *See ACA International v. Federal Communications Commission*, 885 F.3d 687, 695 (D.C. Cir. 2018).

[63] *See* FCC May 14, 2018 Public Notice, CG Docket Nos. 18-152 and 02-278, incorporated herein by reference and attached hereto as Exhibit 1; *see also* 83 Fed. Reg. 26,284 (June 6, 2018).

[64] *See, e.g.*, *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) (affirming summary judgment for defendant on TCPA claim when there was no evidence that equipment "had present capacity to function as an autodialer **by generating random or sequential telephone numbers** and dialing those numbers.  On the contrary, the record indicates that the Email SMS Service sent messages only to numbers that had been individually and manually inputted into its system by a user.") (emphasis added).

[65] *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018) ("[W]e conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes **devices with the capacity to dial stored numbers automatically**.") (emphasis added).

[66] *See* FCC October 3, 2018 Public Notice, CG Docket Nos. 18-152 and 02-278, incorporated herein by reference and attached hereto as Exhibit 2.

ATDS, including the phrase "using a random or sequential number generator"?

2.      Does any device with the capacity to dial stored numbers automatically qualify as an automatic telephone dialing system?

3.      What devices have the capacity to store numbers?   Do smartphones have such capacity?

4.      What devices that can store numbers also have the capacity to automatically dial such numbers?   Do smartphones have such capacity?

5.      How should the FCC reconcile the decisions issued in *ACA International* and *Marks*?[67]

The deadline to file comments expired on October 24, 2018, and thus, the FCC's answers to these questions would appear to be imminent.

The FCC is now headed by Chairman Ajit Pai, who made clear in his dissent to the 2015 FCC ruling that inclusion in the ATDS definition of equipment that does ***not*** have the capacity to randomly or sequentially generate numbers, "is flatly inconsistent with the TCPA."[68]  As explained further below, the FCC's ruling – if it conflicts with *Marks* – will effectively overrule *Marks* pursuant to the Hobbs Act.

## 2.      Resolution Of The ATDS Issue Is Potentially Case Dispositive Here

The ATDS functionality issue is highly relevant here because Plaintiff's entire case rests on the premise that the text message she received was sent to ***her phone number*** – *i.e.*, a preexisting number that was entered into the Ivy system.[69]  As such, her TCPA claim will fail as a matter of law if the FCC rejects the proposition that equipment having this type of functionality (*i.e.*, merely dialing stored numbers) can be an ATDS.

## B.      Argument in Support of Stay

### 1.      Fairness and Efficiency Warrant a *Landis* Stay

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for its litigants."[70]  In determining whether to exercise its discretion to stay a case

---

[67] *See* FCC October 3, 2018 Public Notice, attached hereto as Exhibit 2.
[68] 30 FCC Rcd. 7961.
[69] FAC, at ¶ 23.
[70] *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Stephens v. Comenity, LLC,* 287 F. Supp. 3d 1091, 1096 (D. Nev. 2017) (granting a *Landis* stay).

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

pursuant to its inherent power, a district court should weigh "the competing interests which will be affected by the granting or refusal to grant a stay," including "[1] possible damage which may result from the granting of a stay, [2] the hardship or inequity which a party may suffer in being required to go forward, and [3] the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."[71]  Each of these interests favors a stay in this case.

### a.   Minimal, If Any, Damage Would Result From A Stay

The only conceivable harm that Plaintiff could experience from a stay is temporary delay in pursuing her claims for money damages.  Delay in obtaining money damages, however, does not constitute sufficient prejudice for purposes of the stay analysis.[72]  The requested stay would last only until the FCC issues its ruling on the ATDS definition.  Plaintiff would therefore suffer minimal harm, if any, from a stay of this case.

### b.   Treasure Island Would Suffer Significant Hardship Without A Stay

In the absence of a stay, Treasure Island would be required to spend significant time and resources defending this putative class action lawsuit.  The parties each face the prospect of costly and time-consuming class and merits discovery, dispositive motions, motion for class certification, and trial.  Given that the FCC's ruling could render Plaintiff's claim meritless as a matter of law, all of this cost and time could be wasted if the litigation proceeds now.  Courts considering stays in TCPA cases have held that unnecessary expenses by a defendant constitute sufficient hardship to warrant a stay.[73]

---

[71] *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (internal quotation omitted); *Stephens*, 287 F. Supp. 3d at 1097.

[72] *See Doerken v. USAA Savs. Bank*, CV 16-08824-RSWL-MRW, 2017 U.S. Dist. LEXIS 63474, at *4, 2017 WL 1534186 (C.D. Cal. Apr. 26, 2017) (granting stay and observing that "courts have held that there is no likelihood of damage or harm to the non-moving party merely because a stay could cause a delay to the plaintiff in seeking money damages"); *Reynolds v. Geico Corp.*, Case No. 2:16-cv-01940-SU, 2017 U.S. Dist. LEXIS 28867, at *15, 2017 WL 815238 (D. Or. Mar. 1, 2017) (same).

[73] *See, e.g.*, *Doerken*, 2017 U.S. Dist. LEXIS 63474, at *7, 2017 WL 1534186 ("[P]otential prejudice to Defendant is significant because denying a stay would force Defendant to conduct discovery and defend the TCPA claim in light of the uncertain difference between 'potential' and 'theoretical' capacity under the definition of an ATDS"); *Reynolds*, 2017 U.S. Dist. LEXIS 28867, at *12, 2017 WL 815238 ("defendant will suffer hardship if this action is not stayed.  Both parties face the possibility of unnecessary discovery and trial preparation. . . ."); *Washington v. Six*

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

### c.    A Stay Will Simplify Issues, Proof, And Questions Of Law

A ruling by the FCC that rejects Plaintiff's ATDS theory also would simplify the case by rendering her claim meritless.  This point remains true despite the Ninth Circuit's decision in *Marks* – if the FCC's anticipated ruling conflicts with *Marks*, it will effectively overrule *Marks* because the FCC's orders interpreting the TCPA are binding in courts.  More specifically, judicial review of FCC orders is governed by section 402 of the Communications Act.  Section 402(a) of the Communications Act, in turn, provides that a proceeding to set aside an FCC order must be brought under the Administrative Orders Review Act (also known as the Hobbs Act).  Under the Hobbs Act, a petition brought in the first instance in a federal circuit court is the sole way to challenge an FCC order.[74]

The Ninth Circuit, as well as district courts therein, have interpreted this regime for review of FCC orders to mean that the Hobbs Act divests federal courts – both district and appellate – of jurisdiction in private litigation to accept any position that would conflict with an FCC ruling.[75]

---

*Continents Hotels, Inc.*, Case No. 2:16-cv-03719-ODW (JEMx), 2017 U.S. Dist. LEXIS 3670, at \*6, 2017 WL 111913 (C.D. Cal. Jan. 9, 2017) ("[I]f the Court denies the stay and requires the parties to go forward with this action, they will be forced to spend time and money conducting discovery on a critical issue of liability without knowing what law will ultimately apply at summary judgment or at trial − a fool's errand, to say the least."); *Gage v. Cox Commc'ns, Inc.*, Case No.: 2:16-cv-02708-KJD-GWF, 2017 U.S. Dist. LEXIS 63816, at \* 4, 2017 WL 1536220 (D. Nev. Apr. 26, 2017) ("both parties would be potentially harmed by unnecessary briefing and premature expenditures of time, attorney's fees, and resources if Defendant's Motion to Stay were not granted"); *Coulter v. Ascent Mortgage Resource Group LLC*, No. 2:16-cv-02237-SB, 2017 U.S. Dist. LEXIS 76012, at \*10, 2017 WL 2219040 (E.D. Cal. May 18, 2017) ("a stay would reduce the burden of litigation on the parties," and, "absent a stay, Defendant would suffer hardship in conducting discovery and preparing for trial").

[74] 28 U.S.C. § 2342.

[75] *See, e.g., Pacific Bell Telephone Co. v. California Public Utilities Com'n*, 621 F.3d 836, 843 n.10 (9th Cir. 2010) (finding that under Hobbs Act, Ninth Circuit cannot consider validity of FCC order, reasoning: "[t]he Hobbs Act requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals . . . ***[t]he district court thus lacked jurisdiction to pass on the validity of the FCC regulations***" (emphasis added), citing *U.S. West Communications, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002)); *Baird v. Sabre Inc.*, 995 F. Supp. 2d 1100, 1104 (C.D. Cal. 2014) (rejecting argument that Ninth Circuit decision on interpretation of TCPA should be followed over FCC interpretation, reasoning: "even if the Ninth Circuit's reference in *Satterfield* to the dictionary definition of "express consent" was intended to express disagreement with the FCC's interpretation, ***the Ninth Circuit had no power to reject the FCC rule in the course of an appeal from a judgment denying a TCPA claim***" (emphasis added), citing *U.S. West Communications, Inc. v. Hamilton*, 224 F.3d 1049, 1054 (9th Cir. 2000)); *Booth v. Appstack, Inc.,* Case No. C13-1533JLR, 2016 U.S. Dist. LEXIS 83996, at \* 16, 2016 WL

18

Even if the FCC's anticipated ruling were entitled only to *Chevron* deference, the Ninth Circuit in *Marks* reached its holding only after finding that the relevant language of the TCPA was "ambiguous."[76] The *Marks* court's resolution of that alleged ambiguous language would therefore be trumped by a subsequent FCC interpretation of the same language.[77] Under this reasoning as well, this Court would be bound to follow the FCC's ATDS interpretation in the event it conflicts with the *Marks* court's interpretation.

Notably, when faced with the analogous decision to stay litigation pending ruling on the ATDS issue in *ACA International*, numerous district courts within this Circuit concluded that a stay was appropriate because "the definition of an ATDS is a threshold issue for liability" and "a stay will conserve judicial resources, clarify the law, and aid the court in making a decision on the merits."[78] Their rationale applies with equal force in this case, which involves the same "threshold" ATDS issue.

### 2.    A Stay Is Warranted Under The Primary Jurisdiction Doctrine

The "primary jurisdiction" doctrine is a separate and independent basis for a stay premised on the pendency of the FCC ruling. "Primary jurisdiction . . . is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decision making responsibility should be performed by the relevant agency rather than the courts."[79] To determine

---

3620798 (W.D. Wa. Jun. 28, 2016) (holding that interlocutory appeal of district court order interpreting TCPA would not materially advance ultimate termination of litigation, reasoning: "to the extent an FCC ruling controls [the] issue, Defendants have not followed the procedural prerequisites under the Hobbs Act that are required 'to enjoin, set aside, annul, or suspend' an FCC order . . . *[t]he Ninth Circuit therefore lacks the authority in this case to overturn the 2008 FCC Declaratory Ruling or the 2015 FCC Declaratory Ruling.*") (emphasis added).

[76] *Marks*, 904 F.3d at 1051.

[77] *See National Cable & Telecomms Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (holding that Ninth Circuit erred by following its own prior precedent interpreting statute over subsequent FCC interpretation of same statute, explaining: "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute. . . .").

[78] *Coulter*, 2017 U.S. Dist. LEXIS 76012, at *10; see *also Gage*, 2017 U.S. Dist. LEXIS 63816, at * 4 (finding that a stay "will permit the parties to evaluate, and the Court to consider, viability of the claims under the most complete precedent. This will simplify and streamline proceedings and promote the efficient use of the parties' and the Court's resources."); *Doerken*, 2017 U.S. Dist. LEXIS 63474, at *8 ("In *ACA*, the D.C. Circuit will address, among other things, what type of equipment constitutes an ATDS. Because Plaintiff must prove that Defendant called him using an ATDS to establish a TCPA claim, the definition of an ATDS is indispensable in this litigation.").

[79] *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002); *accord Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008) ("[T]he doctrine is a 'prudential'

19

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

whether to apply the primary jurisdiction doctrine to stay a case, the court should consider four factors: "'(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration.'"[80]

Federal courts across the country have applied the primary jurisdiction doctrine to stay cases pending the FCC's rulings on TCPA issues.[81]  Here, too, the primary jurisdiction factors demonstrate that the FCC – the agency that Congress specifically authorized to construe the TCPA – should determine what type of telephone equipment qualifies as an ATDS before this Court proceeds further in this case.

### a.    This Case Requires The Court To Decide What Constitutes An ATDS

This case satisfies the first primary jurisdiction factor because, as discussed above, Plaintiff seeks to hold Treasure Island liable for alleged TCPA violations based on Treasure Island's purported use of an ATDS.  As such, this lawsuit requires the Court to rule on the precise issue that is pending before the FCC.

---

one, under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.").

[80] *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (quoting *Syntek*, 307 F.3d at 781).

[81] *See, e.g.*, *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 468 (6th Cir. 2010) (applying primary jurisdiction doctrine to allow FCC to interpret several terms used in TCPA and corresponding regulations that were implicated in pending appeal); *Gensel v. Performant Techs., Inc.*, No. 13-C-1196, 2015 U.S. Dist. LEXIS 9736, at * 6, 2015 WL 402840 (E.D. Wis. Jan. 28, 2015) ("In sum, a stay of these proceedings under the primary jurisdiction doctrine will promote uniformity in the administration of the TCPA.  Instead of furthering a split of authority regarding the issues presented by Gensel's complaint, it is more efficient to simply wait for the FCC to do what it has already been asked to do."); *Passero v. Diversified Consultants, Inc.*, 13-CV-338C, 2014 U.S. Dist. LEXIS 72748, at * 8, 2014 WL 2257185 (W.D.N.Y. May 28, 2014) (granting motion to stay pending FCC ruling addressing TCPA's scope and definition of ATDS); *Higgenbotham v. Diversified Consultants, Inc.*, 13-2624-JTM, 2014 U.S. Dist. LEXIS 65915, at *12, 2014 WL 1930885 (D. Kan. May 14, 2014) (same); *Hurrle v. Real Time Resolutions, Inc.*, C13-5765 BHS, 2014 U.S. Dist. LEXIS 22204, at *4, 2014 WL 670639 (W.D. Wash. Feb. 20, 2014) (granting motion to stay pending FCC's consideration of TCPA's scope and ATDS definition); *Mendoza v. UnitedHealth Group Inc.*, 13-1553 PJH, 2014 U.S. Dist. LEXIS 1616, at *7, 2014 WL 722031 (N.D. Cal. Jan. 6, 2014) (same).

**b.      The ATDS Issue Falls Squarely Within The FCC's Regulatory Powers**

This case satisfies the second primary jurisdiction factor because the ATDS issue "fits squarely within" Congress's delegation of TCPA rulemaking authority to the FCC.[82]

**c.      The ATDS Issue Is Part Of A Comprehensive Regulatory Scheme**

This case satisfies the third primary jurisdiction factor because the TCPA subjects phone call activity to comprehensive FCC regulation.  By its plain terms, the TCPA subjects "any person" that makes "any call" to various prohibitions.[83]   And, as discussed in the preceding section, Congress delegated authority to implement this all-encompassing statute to the FCC.

**d.      The TCPA Requires Expertise And Uniformity In Administration**

The fourth primary jurisdiction factor is satisfied because the TCPA requires the FCC's expertise and uniformity in administration.[84]   The FCC, "no surprise, is familiar with the regulations *it* prescribed and possesses expertise over the statute *it* implements, whether that expertise comes in the form of technical experts, agency lawyers or agency staff in a position to obtain input from the relevant stakeholders."  *Charvat*, 630 F.3d at 467 (internal citations omitted; emphasis in original).[85]

---

[82] *See Time Warner Cable*, 523 F.3d at 1115.

[83] 47 U.S.C. § 227(b)(1).

[84] *See Davel Communs., Inc. v. Qwest Corp.*, 460 F.3d 1075, 1090 (9th Cir. 2006) ("It is precisely the purpose of the primary jurisdiction doctrine to avoid the possibility of conflicting rulings by courts and agencies concerning issues within the agency's special competence."); *Gusman v. Comcast Corp.*, Case No. 13-cv-1049-GPC(DHB), 2014 U.S. Dist. LEXIS 69918, at *7, 2014 WL 2115472 (S.D. Cal. May 21, 2014) ("The FCC has regulatory authority that subjects the industry to a comprehensive regulatory scheme *that requires expertise or uniformity in administration*." (emphasis added) (internal quotations omitted).

[85] "The court agrees with defendant that the statutory reference to 'capacity' is unclear.  The seminal question of its reach is a technical one, which falls in the ambit of the FCC's administrative expertise. . . . It is proper for the FCC to make this determination in the first instance, such that uniformity and consistency in the application of the TCPA can be accomplished."  *Higgenbotham*, 2014 WL 1930885, at *3.

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

**V.     CONCLUSION**

For the reasons stated herein, the Court should dismiss the FAC in its entirety. Alternatively, the Court should stay the case until the FCC issues its anticipated ruling interpreting ATDS.

Dated: July 26, 2019.                    BALLARD SPAHR LLP

By: /s/ Joel E. Tasca
    Joel E. Tasca
    Nevada Bar No. 14124
    Stacy H. Rubin
    Nevada Bar No. 9298
    1980 Festival Plaza Drive, Suite 900
    Las Vegas, NV 89135
    *Attorneys for Defendant*

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on July 26, 2019, a true and correct copy of the foregoing **DEFENDANT'S AMENDED MOTION TO DISMISS FIRST AMENDED COMPLAINT, OR IN THE ALTERNATIVE, FOR A STAY** was served electronically and by the Court's CM/ECF system on all parties who have appeared in this action:

David C. O'Mara
The O'Mara Law Firm, P.C.
311 East Liberty Street
Reno, NV 89501

Lionel Z. Glancy
Marc L. Godino
Danielle L. Manning
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Mark S. Greenstone
Greenstone Law APC
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

*Attorneys for Plaintiff Jessica DeMesa*

/s/ Mary Kay Carlton
An Employee of Ballard Spahr LLP

Ballard Spahr LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958
(702) 471-7000

23