Joel E. Tasca, Esq.
Nevada Bar No. 14124
BALLARD SPAHR LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135
Tel./Fax (702) 471-7000/7070
tasca@ballardspahr.com
*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JESSICA DEMESA, as an individual and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TREASURE ISLAND, LLC,<br>            Defendant. | Case No.: 2:18-cv-02007-JAD-NJK<br><br>**DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

### A.  Plaintiff's Arguments Do Not Save Her ATDS Theory

#### 1.  An ATDS Must Randomly Or Sequentially Generate *Telephone* Numbers

As Treasure Island explained in its opening brief, an ATDS requires that ***the phone number itself*** be created using a random or sequential number generator – a conclusion, as explained in cases such as *Tehrani v. Joie De Vivre Hospitality, LLC*,[1] that is supported by the text of the statutory definition of ATDS, the Supreme Court's choice in the landmark *Facebook, Inc. v. Duguid*[2] decision to side with Courts of Appeals that adopted that view, and an analysis of the harms the TCPA was designed to remedy.[3]  Since the filing of Treasure Island's opening brief, still other district courts have reached this conclusion.[4]

---

[1] 2021 U.S. Dist. LEXIS 165392 (N.D. Cal. Aug. 31, 2021).
[2] 141 S. Ct. 1163 (2021)
[3] ECF No. 89 pp. 6–8.
[4] *Raphael Aus. v. Alorica, Inc.*, 2021 U.S. Dist. LEXIS 240677, at *6 (C.D. Cal. Dec. 16, 2021) (ATDS requires that "***telephone*** numbers" be "generated using a random or sequential number generator") (emphasis added); *Pascal v. Concentra, Inc.*, 2021 U.S. Dist. LEXIS 239583, at *24 (N.D. Cal. Dec. 14, 2021) ("requirement that a 'number' must be stored or produced by an autodialer implicitly refers to a ***telephone*** number," and therefore "generation and assignment of random or sequential numbers to telephone numbers that were uploaded or manually input . . . is not sufficient to establish that an autodialer was used"); *Cole v. Sierra Pac. Mortg. Co.*, No. 2021

Moreover, as Treasure Island explained, Plaintiff's *own allegations* establish that *she provided* her phone number to Treasure Island, and thus Treasure Island did not randomly or sequentially generate her phone number.[5]

### a. Plaintiff Ignores Several Of Treasure Island's Arguments

Plaintiff fails to even try to address some of these points. Most significantly, Plaintiff does not contest that *she provided* her phone number to Treasure Island, and thus Treasure Island did not randomly or sequentially generate her phone number.

Nor has Plaintiff addressed several of Treasure Island's arguments that an ATDS must generate *telephone* numbers. For example, Plaintiff ignores that the Supreme Court in *Duguid* cited approvingly the circuit court "authority indicat[ing] that the number generator must in fact create *telephone* numbers," thereby implicitly adopting the conclusions of those circuit courts.[6] Plaintiff also fails to address the point that "little would be gained by finding a TCPA violation based on a preexisting customer database" in view of the particular harms the TCPA was designed to prevent.[7] Notably, since Treasure Island's opening brief, another court made this same point in dismissing a TCPA claim under Rule 12(b)(6).[8]

### b. Plaintiff's Textual Arguments Are Unpersuasive

Plaintiff does attempt to make an argument based on the text of the statutory ATDS definition. Plaintiff argues that "[t]he use of the phrase 'telephone numbers to be called' in the same code section as 'number generator' and the key distinction between the term 'telephone

---

U.S. Dist. LEXIS 239792, at *8 (N.D. Cal. Dec. 15, 2021) (ATDS does not exist when "telephone numbers . . . were not themselves produced randomly or sequentially").

[5] ECF No. 89 pp. 6–8.

[6] *Tehrani*, 2021 U.S. Dist. LEXIS 165392, at *11. *Accord Pascal*, 2021 U.S. Dist. LEXIS 239583, at *24 (ATDS requires that a random or sequential number generator create *telephone* numbers, reasoning, in part, that Supreme Court in *Duguid* cited approvingly circuit court opinions in which courts reached that conclusion); *Hufnus v. Donotpay, Inc.*, No. 20-cv-08701-VC, 2021 U.S. Dist. LEXIS 118325, at *4 (N.D. Cal. Jun. 24, 2021) (same).

[7] *Tehrani*, 2021 U.S. Dist. LEXIS 165392, at *13.

[8] *Alorica,* 2021 U.S. Dist. LEXIS 240677, at *10–*11 (explaining that Congress's concerns in enacting the TCPA – as identified by the Supreme Court in *Duguid* – are not present "in a case where the phone numbers being dialed come from a legitimate list of customer or client contacts rather than the workings of a random or sequential number generator. . . . [Plaintiff's] allegations therefore present no concern that EGS's system will seize up the telephone lines of public emergency services, tie up the lines of businesses with sequentially numbered phone lines, or cause inconvenience or expense to owners of individual cell or home phone numbers who have nothing to do with [the defendant]").

number' and 'number' thereafter indicate that a number generator is not referring to a telephone number generator. Otherwise, the statute would have said 'to store or produce telephone numbers to be called, using a random or sequential [telephone] number generator.'"[9]

Plaintiff's argument, however, ignores that Section 227(a)(1) also refers to "numbers" in Subsection (B)'s phrase, "to dial such numbers." Plainly, Subsection (B) means *telephone* numbers when it refers to "dial[ing] . . . numbers" – after all, what other "numbers" would be "dial[ed]" besides *telephone* numbers? Because two references to "numbers" in the ATDS definition unquestionably refer to *telephone* numbers, it cannot be inferred that Congress intended the definition's sole remaining reference to "numbers" to mean something different.

The court in *Tehrani* made precisely this point:

> [A]s a textual matter, the "*number* generator" (whether random or sequential) specified in § 227(a)(1)(A) implicitly refers back to a "telephone number[]" – *i.e.*, the preceding phrase – and not to an index number. This implicit reference is confirmed by subsection (B) which refers to the capacity to *dial* "such numbers." Thus, throughout § 227(a)(1), the term "number[s]" refers to *telephone* numbers.[10]

Just weeks ago, another district court within this Circuit concluded the same.[11] For her own part, Plaintiff cites no cases where a court has reached the statutory interpretation she espouses here.

Plaintiff also tries to find support in the word "produce" in the ATDS statutory definition. Specifically, she argues that "*produce* telephone numbers" as used in Section 227(a)(1) means something different from "*create* telephone numbers."[12] In support of this argument, she cherry-picks one of several dictionary definitions of "produce" that she believes is favorable to her – *viz.*, "to offer to view or notice."[13] Yet, prior to Plaintiff's proposed definition, the same dictionary describes the "Essential Meaning" of "produce" as follows:

---

[9] ECF No. 97 p. 6 n.3.
[10] 2021 U.S. Dist. LEXIS 165392, at *10.
[11] *See Pascal*, 2021 U.S. Dist. LEXIS 239583, at *24 (agreeing with the *Tehrani* court's conclusion "that under Section 227(a)(1), the requirement that a 'number' must be stored or produced by an autodialer implicitly refers to a telephone number," based on "the reference in subsection (B) to the capacity to dial 'such numbers'").
[12] ECF No. 97 p. 1.
[13] *Id.* (citing *Produce, Merriam Webster Dictionary online*, https://www.merriam-webster.com/dictionary/produce (last visited Jan. 10, 2022)).

**Essential Meaning of** *produce*

**1:** to make (something) especially by using machines
The factory *produces* [=*manufactures*] steel.
Thousands of cars are *produced* here each year.

**2:** to make or create (something) by a natural process
The tree *produces* good fruit.
Honey is *produced* by bees.
twins *produced* from a single egg

**3:** to cause (something) to exist or happen **:** to cause (a particular result or effect)
The insect bite *produced* a rash.
His suggestion *produced* the desired results.[14]

Thus, based on the more well-rounded "Essential Meaning" definition of "produce" from the same dictionary on which Plaintiff relies, "produce" means to "make" or "create" or "cause (something) to exist." These definitions clearly cut against Plaintiff's argument that to "produce" a telephone number means something different from to "create" a telephone number.

### c. Plaintiff's "Predictive Dialer" Arguments Are Meritless

Plaintiff also tries to support her position by arguing that the Supreme Court in *Duguid* did not expressly conclude that "predictive dialers" – which, as Plaintiff notes, "call from a stored list of phone numbers," and thus are similar to the "SMS text blaster" that she conclusorily alleges Treasure Island used here[15] – fall outside the scope of the ATDS definition.

Initially, it is true that the Supreme Court in *Duguid* did not ***expressly*** hold that a predictive dialer is not an ATDS. But the absence of such an express holding in *Duguid* is not surprising given that the facts of *Duguid* did not specifically involve a predictive dialer. The Supreme Court in *Duguid*, however, did implicitly reject that a predictive dialer can be an ATDS when it sided ***against*** two Courts of Appeals that previously held that equipment that dials from a stored list (like a predictive dialer) ***can be*** an ATDS.[16] Indeed, one of these Court of Appeals decisions – *Allan* – even specifically involved a predictive dialer.[17] The *Tehrani* court relied on

---

[14] *See Produce, Merriam Webster Dictionary online*, https://www.merriam-webster.com/dictionary/produce (last visited Jan. 10, 2022).
[15] ECF No. 97 p. 12.
[16] *Duguid*, 141 S. Ct. at 1168 n.4 (resolving split by rejecting *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 290 (2d Cir. 2020); and *Allan v. Penn. Higher Educ. Assistance Agency*, 968 F.3d 567, 579–80 (6th Cir. 2020)).
[17] *See Allan*, 968 F.3d at 570 (explaining that "type of automated-calling device" involved in that case "[was] called a 'predictive dialer'").

this same reasoning to conclude that, after *Duguid*, an ATDS does not cover equipment – like a predictive dialer – that dials from a stored list of pre-existing phone numbers.[18]

### d. Footnote 7 Of *Duguid* Does Not Support Plaintiff's Position

As expected, Plaintiff also tries to rely on the Supreme Court's reference to a "preproduced list" in footnote 7 of *Duguid*.[19] Plaintiff, however, ignores the point made by numerous district courts that the Supreme Court's reference in footnote 7 of *Duguid* to a preproduced list (1) was *dicta*, and (2) when read in context, plainly was not referring to a "pre-existing list" of phone numbers, and instead it was referring to a "list of phone numbers that was generated by a number generator."[20] Moreover, in the face of all Treasure Island's cited cases, Plaintiff cites no case in which any court has adopted her view of footnote 7 of *Duguid*.[21]

---

[18] 2021 U.S. Dist. LEXIS 165392, at *11 (concluding that the "Supreme Court [in *Duguid*] implicitly rejected" that ATDS can encompass equipment that dials from stored lists when it resolved circuit split against Courts of Appeals that so held).

[19] ECF No. 97 p. 12.

[20] *Tehrani*, 2021 U.S. Dist. LEXIS 165392, at *16. *See also* ECF No. 89 p. 8 n.38 (citing numerous cases). Since the filing of Treasure Island's opening brief, still other district courts within this Circuit have rejected attempts by plaintiffs to rely on footnote 7 of *Duguid*. *See Alorica*, 2021 U.S. Dist. LEXIS 240677, at *9 (in example from amicus brief involving preproduced list cited in footnote 7 of *Duguid*, "the hypothetical system indeed uses a random number generator to determine the order in which to call numbers on a preproduced list – **but that preproduced list was itself a list of phone numbers *generated by a random or sequential number generator*.**") (emphasis added); *Pascal*, 2021 U.S. Dist. LEXIS 239583, at *26 ("Read out of context, the statement in Footnote 7 referencing an autodialer that 'use[s] a random number generator to determine the order in which to pick phone numbers from a preproduced list' might suggest that even where a platform sends messages to a list of telephone numbers that was created in a non-random fashion, as is the case here, an autodialer is used if the order in which they are contacted relies on a random or sequential number generator. As many courts have observed, however, ***the reference to a 'preproduced list' in Footnote 7 was based on a specific technology described in the PACE Amicus Brief and that brief makes clear that the preproduced list was itself randomly generated***.") (emphasis added).

[21] In a footnote, Plaintiff asserts: "Although there is not much post-*Facebook* caselaw interpreting footnote 7, one district court recently held that a system which automatically re-sequenced numbers on a campaign list would have qualified as an autodialer, if not for the fact that there was no evidentiary showing in the record by plaintiff that it did so by using a random or sequential number generator." ECF No. 97 p. 14 n.8 (citing *Grome v. USAAA Sav. Bank*, No. 4:19-CV-3080, 2021 U.S. Dist. LEXIS 164255, at *14 (D. Neb. Aug. 31, 2021)). But the *Grome* court never said that the system at issue "would have qualified as an autodialer" under footnote 7 of *Duguid* had only the plaintiff presented evidence that a random or sequential number generator resequenced pre-existing numbers on a stored list. A much fairer reading of *Grome* is that the court did not have to address the plaintiff's contention regarding the proper interpretation of footnote 7 of *Duguid* because, even accepting plaintiff's proposed interpretation, it was undisputed that no random or sequential generator was used. *Id.* at *9–*15.

### e. Treasure Island's Position Would Not Render The Consent Requirement Of The TCPA "Irrelevant Surplusage"

Plaintiff also argues that, "reading *Facebook* to preclude dialing systems that dialed stored lists of numbers using algorithmic data pulls would render the consent requirements set forth under 47 U.S.C. § 227(b)(1)(A) irrelevant surplusage" because "there is by definition a lack of consent" when an autodialer "is required to self-generate its own lists of numbers to dial."[22]

Plaintiff's argument refers to the prohibition under the TCPA against making "any call (other than a call . . . made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice."[23] Even accepting Plaintiff's premise that a caller could "never" get the prior consent of a party whose number the caller's ATDS later randomly or sequentially generated, prior express consent – as the portion of Section 227(b)(1)(A) just quoted demonstrates – is also a defense to calls made ***using an artificial or prerecorded voice***. Thus, for example, a business could get the prior express consent of its customer at the inception of their relationship to be called using a prerecorded voice, and that consent would serve as a defense for the business if the customer tried to sue the business under Section 227(b)(1)(A) for later calling the customer using a prerecorded voice. As just this one example (which happens all the time in real life) demonstrates, Treasure Island's position would not render the consent provision "irrelevant surplusage" as Plaintiff claims.[24]

### f. Discovery Is Not Necessary To Reject Plaintiff's Arguments

Plaintiff repeatedly contends that it would be improper for the Court to grant Treasure Island's motion to dismiss because discovery is necessary before the Court can conclude that the equipment at issue here was not an ATDS. No discovery is necessary, however, when – as here – the plaintiff has expressly alleged that the telephone number that was called or texted was not

---

[22] ECF No. 97 p. 14.
[23] 47 U.S.C. § 227(b)(1)(A).
[24] The court in *Alorica* – again, decided after Treasure Island filed its opening brief – pointed out still another problem with Plaintiff's argument that simply storing numbers in a sequential way can make a piece of equipment an ATDS – liability would depend arbitrarily on whether a defendant stored its customer numbers in a program using numbered lines as opposed to *non*-numbered lines. 2021 U.S. Dist. LEXIS 240677, at *13–*15. As the court explained: "These fine distinctions have nothing to do with any of the reasons Congress passed the TCPA, and the fact that [plaintiff's] proffered interpretation leads the Court into this territory is strong evidence that [plaintiff's] interpretation is far afield from Congress' intentions." *Id.* at *15.

DMFIRM #401347621 v1                              6

randomly or sequentially generated, but rather was supplied to the defendant by the plaintiff. Indeed, as set forth in Treasure Island's opening brief, numerous courts post-*Duguid* have dismissed TCPA cases at the pleadings stage in nearly identical circumstances.[25]

Plaintiff cites various cases that she claims support her position, but none of them actually do. She cites *Flores v. Adir International, LLC*,[26] but that case (from 2017) long pre-dated the Supreme Court's decision in *Duguid*, which – as explained above – forecloses the possibility that dialing equipment can be an ATDS when it simply dials from a stored list.

Most of Plaintiff's post-*Duguid* cases are distinguishable because, in each one, the plaintiff – unlike here – did not allege that he or she ***provided*** a phone number to the defendant, thus leaving open the possibility that the defendant could have used a random or sequential number generator to create the phone number that was dialed.[27] In fact, one court that recently dismissed a TCPA claim under Rule 12(b)(6) distinguished most of these same cases on this precise basis when the plaintiff claimed they supported allowing his case to go to discovery.[28]

Plaintiff also cites *Bell v. Portfolio Recovery Associates, LLC*, but that case was well past the pleadings stage, and in fact dispositive motions already were pending, when *Duguid* was

---

[25] ECF No. 89 p.5 n.24 (citing cases disposed of at pleadings stage). *Accord Alorica*, 2021 U.S. Dist. LEXIS 240677, at *22.

[26] ECF No. 97 p. 9 (citing *Flores v. Adir International, LLC*, 685 Fed. Appx. 533 (9th Cir. Mar. 24, 2017).

[27] *See Gross v. GG Homes, Inc.*, 2021 U.S. Dist. LEXIS 127596, at *21–*22 (S.D. Cal. July 8, 2021) (noting that there was no allegation that plaintiff had provided her number to defendant); *Miles v. Medicredit, Inc.*, 2021 U.S. Dist. LEXIS 131128, at *10 (E.D. Mo. July 14, 2021) (calls were placed to plaintiff's number in effort to collect debt allegedly owed by unknown third-party); *Montanez v. Future Vision Brain Bank, LLC*, 2021 U.S. Dist. LEXIS 67091, at *3 (D. Colo. Apr. 29, 2021) (none of the messages received were "addressed specifically to Plaintiff"); *Jance v. Homerun Offer LLC*, 2021 U.S. Dist. LEXIS 143145, at *10 (D. Ariz. July 30, 2021) ("Plaintiff alleges he had no business relationship with Defendants, did not give Defendants his contact information, and did not consent to be contacted by Defendants"); *Atkinson v. Pro Custom Solar LLC*, 2021 U.S. Dist. LEXIS 112396, at *3 (W.D. Tex. Jun. 16, 2021) (plaintiff did not allege defendant placed "targeted" calls or texts to her); *Garner v. Allstate Ins. Co.*, 2021 U.S. Dist. LEXIS 163121, at *2 (N.D. Ill. Aug. 30, 2021) ("Plaintiffs are individuals who have no established business relationship with Allstate, [and] never gave Allstate permission to call their cellphones"); *Callier v. Greensky, Inc.*, 2021 U.S. Dist. LEXIS 126769, at *3 (W.D. Tex. May 10, 2021) (defendant repeatedly called plaintiff asking for unknown third-party).

[28] *Brickman v. Facebook, Inc.*, 2021 U.S. Dist. LEXIS 175700, at *10–*11 (N.D. Cal. Apr. 15, 2021) ("I recognize that some courts have considered the determination of whether a plaintiff has plausibly shown the use of an ATDS covered by *Duguid* to be more appropriately resolved on summary judgment than at the pleading stage. But in many of those cases, the plaintiffs alleged that they had *never* provided defendant with their phone numbers in the first place, making it at least plausible that a prohibited number generator had been used to produce or store the numbers called.") (distinguishing *Gross*, *Miles*, *Montanez*, and *Jance* on this ground).

1 decided.[29]  Similarly, in *Carl v. First National Bank*[30] – cited by Plaintiff – the parties already 2 had filed summary judgment motions by the time *Duguid* was decided.  Because these cases 3 already were beyond the pleadings stage when *Duguid* was decided, they provide no support for 4 Plaintiff's contention that the Court here should reject Treasure Island's sound legal arguments 5 for dismissal on the pleadings so that she can take discovery.

       **2.**     ***Even If* Plaintiff Were Legally Correct That An ATDS Need Not Randomly Or Sequentially Generate Phone Numbers, Plaintiff Ignores Treasure Island's Alternative Argument That Her Allegations *Still* Would Fail To Allege Use Of An ATDS**

9 As Treasure Island explained in its opening brief, ***even if*** the Court were to conclude that 10 an ATDS need not necessarily randomly or sequentially generate telephone numbers, here 11 Plaintiff's ATDS theory still would be deficient because the facts alleged make clear that no 12 random or sequential process was used in any aspect of the storage or production of Plaintiff's 13 phone number.[31]  Rather, the only plausible inference from the facts alleged is that the subject 14 text message to Plaintiff was specifically targeted to her at a specific time upon the happening of, 15 as Plaintiff puts it, an "organic event" – *i.e.*, Plaintiff's check-in at the hotel.[32]  In its opening 16 brief, Treasure Island cited a legion of post-*Duguid* cases in which courts have rejected ATDS 17 theories at the pleadings stage on this precise basis.[33]

18 In response, Plaintiff completely ignores this argument by Treasure Island, including all 19 of the well-reasoned post-*Duguid* cases in which district courts have rejected ATDS theories in 20 cases involving allegations closely similar to those here.  In fact, Plaintiff's lengthy discussion in 21 her opposition brief about "SMS text blasters" – which she conclusorily alleges Treasure Island 22 used here – demonstrates that, in reality, it is ***implausible*** that Treasure Island used an SMS text 23 blaster to send her the subject text message given the facts that Plaintiff alleges.

24 Specifically, Plaintiff's opposition brief makes clear that, at bottom, the key feature of an 25 SMS text blaster is that it takes a list of phone numbers, rearranges them for storage in a random

---

[29] 2021 U.S. Dist. LEXIS 75096, at *1–*3 (W.D. Tex. Apr. 13, 2021).
[30] 2021 U.S. Dist. LEXIS 111889, at *21 n.10 (D. Me. Jun. 15, 2021).
[31] ECF No. 89 pp. 8–9.
[32] *Id.*
[33] *See* ECF No. 89 p. 9 n.41.

Ballard Spahr LLP
One Summerlin, 1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958

or sequential way, and then selects them for dialing in a random or sequential way. As Plaintiff explains: "Storage and production occur automatically, without any organic triggering event by a human. The aforementioned [random or sequential number generation] process determines which order and sequence the list of telephone numbers are to be stored, produced, and automatically dialed, as well as the rate at which this process occurs."[34] As Plaintiff further explains: "The program for the dialing campaigns is pre-set like a sprinkler timer to dial the phone numbers at pre-set intervals and pre-set time periods. This process isسometimes referred to as algorithmic dialing."[35] Plaintiff's explanation goes on: "All SMS blasters rely on random or sequential number generators to instruct the data set to store and produce telephone numbers to the dialer. Without this key component, a dialing campaign would require an agent to manually place the call, via organic decision making, or as was the case in *Facebook*, through some other organic one-to-one triggering event that instructs the dialer to place the call."[36]

But ***the facts*** that Plaintiff alleges regarding the subject text message render it implausible that Treasure Island sent it to her via the random or sequential SMS text blaster process described by Plaintiff. As Treasure Island explained in its opening brief, the Complaint alleges that Plaintiff received a text message an hour after she checked into the hotel asking her how her check-in experience and room were.[37] The Complaint similarly alleges that all putative class members were texted "upon check-in."[38] Thus, rather than being texted through a random or sequential method, the alleged text messages here were targeted to specific individuals at specific times upon the occurrence of specific events – *i.e.,* to Hotel guests upon Hotel check-in. The check-in was the "organic one-to-one triggering event" for the text message, which, according to Plaintiff's own allegations, means that an SMS text blaster was ***not*** used.[39]

Plaintiff's discussion of the Supreme Court's *Duguid* decision further illustrates Treasure Island's point. As Plaintiff explains: "In *Facebook,* that organic event was a human being trying to gain access to a user's Facebook account without authorization, and Facebook's system being

---

[34] *See* ECF No. 89 p. 5.
[35] *Id.* p. 6.
[36] *Id.* p. 7 (footnote omitted).
[37] ECF No. 89 pp. 8–9 (citing SAC ¶ 24).
[38] *Id.* p. 9 (quoting SAC ¶ 27).
[39] *See* ECF No. 97 p. 7.

DMFIRM #401347621 v1              9

programmed to notify the owner of the account when this happened. *Duguid* should never have been subject to an appeal, because the system unquestionably did not use random or sequential number generation. Just because a robot sent the message does not mean random or sequential number generation is involved. Robots can be programmed to complete isolated tasks by their operators upon the occurrence of an isolated organic triggering event."[40] Just as the attempt to access an account was the organic triggering event for Facebook's robot to send the text message to an accountholder in *Duguid*, the check-in at the Hotel was the organic triggering event for Ivy to send the text message to Plaintiff in this case. As Plaintiff admits, such a system "unquestionably" does "not use random or sequential number generation."[41]

In sum, even accepting Plaintiff's legal interpretation of ATDS, she still would not be entitled to discovery given that her own factual allegations belie her conclusory assertion that an SMS text blaster was used to send her the subject text.

### B. The Court Should Reject Plaintiff's Attempts To Equate A Text Message With "An Artificial Or Prerecorded Voice"

In its opening brief, Treasure Island explained that the Court should reject Plaintiff's theory that the text message she received was an artificial or prerecorded "voice" because: (i) all relevant authorities – including the FCC and the Ninth Circuit – have repeatedly distinguished between "text" and "voice" calls; (ii) courts that have addressed the term "voice" as used in the TCPA have consistently held that it requires speaking, or at least some sort of audible sound, (iii) the dictionary definition of "voice" touted by Plaintiff is not a common definition and makes no sense in the context of the TCPA; and (iv) Plaintiff has not cited a single case in which a court has interpreted "voice" in the way she is advancing here.[42]

In response, Plaintiff completely ignores the case law cited by Treasure Island and the arguments that Treasure Island made in connection therewith. She baldly asserts that, "if texts are calls, then texts are voices,"[43] but her argument cannot be squared with the clear delineation – detailed in Treasure Island's opening brief – between "voice calls" and "text calls" that both the

---

[40] *Id.* at p. 7 n.4.
[41] *Id.*
[42] ECF No. 89 pp. 10–14.
[43] *See* ECF No. 97 p. 18.

Ninth Circuit and the FCC have articulated.[44] Plaintiff also continues to be unable to cite a single case supporting her interpretation.

Plaintiff argues that certain dictionary definitions of "voice" extend beyond "oral utterances, vocal chords, and the like."[45] But when a statutory term has multiple meanings, courts must consult the context of the statute to discern the term's meaning.[46] Here, Section 227(b) of the TCPA regulates communications without regard to their substantive content, and so it is highly unlikely that Congress when drafting the TCPA was focused on regulating the "voice" of people in the sense of their ability to express "opinions" or "concerns," as Plaintiff suggests. Certainly she cites nothing in the legislative history supporting such an interpretation.

Plaintiff also argues that the term, "voice," in the statute should essentially be ignored because Congress's real concern in adopting the "artificial or prerecorded voice" language in Section 227(b) was the prevention of "agentless" calls.[47] It is true that the legislative history of the TCPA cited by Plaintiff supports the notion that Congress was concerned about agentless calls.[48] But that was not Congress's sole concern. The legislative record also states that artificial and prerecorded voice messages – in part because of their tendency to be long – were clogging answering machines, and thus costing consumers time and money to clear.[49] This concern does not exist with texts, which are fleeting and easily deleted, and so this aspect of the legislative history does not support interpreting "artificial or prerecorded voice" to cover text messages.

Moreover, Congress addressed its concern over "agentless calls" through its use of the terms "artificial" and "prerecorded." But those terms are only part of the relevant phrase – the

---

[44] *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (citing several FCC opinions that distinguish between voice calls and text messages).
[45] ECF No. 97 p. 16.
[46] *See, e.g.*, *Sony Comput. Entm't Am., Inc. v. Am. Home Assur. Co.*, 532 F.3d 1007, 1013 (9th Cir. 2008) (citation omitted) (finding that "[a]lthough examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context"); *Gordon v. Virtumundo*, 575 F.3d 1040, 1062 (9th Cir. 2009) (noting that because two terms were not defined by the statute, "they should be given their ordinary meaning" and applying canon of statutory interpretation, *noscitur a sociis*, to evaluate the context surrounding the terms).
[47] *Id.* pp. 16–18.
[48] *See* ECF No. 97 pp. 16–17.
[49] *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, at *219 (2003) (recognizing that the "practice of *sending prerecorded messages*" to phones is "widespread" and that such prerecorded messages "often fill up the tapes of [consumers'] answering machines") (emphasis added).

prohibition is on use of any "artificial or prerecorded *voice*."[50]  Congress could have used other phrases if it was concerned solely with agentless-calls, such as "prerecorded messages," "prerecorded content," "artificial communications," or "agentless calls," but it did not.  Instead, Congress prohibited calls using an "artificial or prerecorded *voice*," and it must be assumed that Congress intended its chosen word, "voice," to have and be accorded independent significance.[51]

Finally, Plaintiff's asserted definition of "voice" is so overinclusive that it would produce absurd results.  If the Court were to adopt Plaintiff's definition of "prerecorded voice," *every* text message would violate the TCPA.  After all, every text message is "prerecorded" in the sense that it is "record[ed] in advance of presentation or use,"[52] and is "set down in writing,"[53] because, by their very nature, text messages are typed out in advance of being sent.  Nothing suggests that Congress intended for Section 227(b) to impose such a sweepingly broader prohibition on text messages (which did not even exist when the TCPA was enacted) than it did for voice calls.

DATED this 10th day of January, 2022.

BALLARD SPAHR LLP

By: /s/ Joel E. Tasca
    Joel E. Tasca, Esq.
    Nevada Bar No. 14124
    1980 Festival Plaza Drive, Suite 900
    Las Vegas, Nevada 89135
    *Attorneys for Defendant*

---

[50] 47 U.S.C. § 227(b)(1)(A) (emphasis added).

[51] *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (Courts presume that "a legislature says in a statute what it means and means in a statute what it says there.").

[52] *See* ECF No. 97 p. 15 (citing *Artificial, Webster's Ninth New Collegiate Dictionary*, 106 (1991)).

[53] *See id.* (citing *Prerecorded, Webster's Ninth New Collegiate Dictionary*, 984 (1991)).

DMFIRM #401347621 v1    12

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on January 10, 2022, a true and correct copy of the foregoing **DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** was served electronically and by the Court's CM/ECF system on all parties who have appeared in this action:

Tom E. Wheeler
Law Offices of Todd M. Friedman, P.C.
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364

David C. O'Mara
The O'Mara Law Firm, P.C.
311 East Liberty Street
Reno, NV 89501

Lionel Z. Glancy
Marc L. Godino
Danielle L. Manning
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

Mark S. Greenstone
Greenstone Law APC
1925 Century Park East, Suite 2100
Los Angeles, CA 90067

*Attorneys for Plaintiff Jessica DeMesa*

                                        /s/ M.K. Carlton
                                        An Employee of Ballard Spahr LLP

Ballard Spahr LLP
One Summerlin, 1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135-2958